**In re WORLDCOM, INC., et al.,**
**Reorganized Debtors.**

No. 02–13533(AJG).

United States Bankruptcy Court,
S.D. New York.

June 30, 2004.

---

**8.** See, for example, 71 N.Y.Jur.2d, Insurance § 2091 regarding rights of an "irrevocable beneficiary," etc.

Commissioner of Revenue, James L. O'Connor, Jr., Esq., Jeffrey S. Ogilvie, Esq., of Counsel, Boston, MA, on Behalf of the Commonwealth of Massachusetts and the States of Alabama, Arkansas, Connecticut, Florida, Georgia, Iowa, Kentucky, Maryland, Michigan, Missouri, New Jersey, Pennsylvania, and Wisconsin.

Weil, Gotshal & Manges LLP, Marcia L. Goldstein, Esq., Lori R. Fife, Esq., Alfredo R. Perez, Esq., Adam P. Strochak, Esq., of Counsel, New York, NY, for Debtors.

McGuirewoods LLP, Anne Marie Whittemore, Esq., H. Slayton Dabney, Jr., Esq., of Counsel, Richmond, VA, McGuirewoods LLP, Patrick L. Hayden, Esq., of Counsel, New York, NY, Greenberg Traurig, LLP, Thomas J. Weber, Esq., of Counsel, New York, NY, Co–Counsel for KPMG LLP.

**MEMORANDUM DECISION REGARDING MOTION BY THE COMMISSIONER OF REVENUE FOR THE COMMONWEALTH OF MASSACHUSETTS FOR AND ON BEHALF OF MASSACHUSETTS AND THE STATES OF ALABAMA, ARKANSAS, CONNECTICUT, FLORIDA, GEORGIA, IOWA, KENTUCKY, MARYLAND, MICHIGAN, MISSOURI, NEW JERSEY, PENNSYLVANIA, AND WISCONSIN FOR ENTRY OF AN ORDER DISQUALIFYING KPMG LLP FROM SERVING AS ACCOUNTANT, AUDITOR AND TAX ADVISOR TO THE DEBTORS AND DIRECTING DISGORGEMENT OF ALL FEES PAID TO KPMG LLC**

ARTHUR J. GONZALEZ, Bankruptcy Judge.

Before the Court is the Motion By the Commissioner of Revenue for the Com-

monwealth of Massachusetts for and on Behalf of Massachusetts and the States of Alabama, Arkansas, Connecticut, Florida, Georgia, Iowa, Kentucky, Maryland, Michigan, Missouri, New Jersey, Pennsylvania, And Wisconsin (the "States") for Entry of an Order Disqualifying KPMG LLP From Serving as Accountant, Auditor and Tax Advisor to the Debtors and Directing Disgorgement of All Fees Paid to KPMG LLC, filed March 17, 2004 (the "Disqualification Motion"); the Response and Objection of KPMG LLP to Motion by the Commissioner of Revenue for the Commonwealth of Massachusetts for and on Behalf of Certain States Seeking Disqualification of KPMG LLP and Other Relief, dated April 8, 2004 ("KPMG Response and Objection"); the Debtors' Objection to the Motion By the Commissioner of Revenue for the Commonwealth of Massachusetts, on Behalf of Certain States, for an Order Disqualifying KPMG LLP From Serving as Accountant, Auditor and Tax Advisor to the Debtors and Directing Disgorgement of All Fees Paid to KPMG LLP, dated April 8, 2004 ("Debtors' Objection"); the Joinder of the Official Committee of Unsecured Creditors of WorldCom, Inc., et al. to Debtors' Objection to Motion by the Commissioner of Revenue for the Commonwealth of Massachusetts, on Behalf of Certain States, for an Order Disqualifying KPMG LLP from Serving as Accountant, Auditor and Tax Advisor to the Debtors

and Directing Disgorgement of All Fees Paid to KPMG LLP, dated April 8, 2004 ("Joinder" and together with the KPMG Response and Objection and the Debtors' Objection the "Objections"); and other briefing.[1] In short, the Disqualification Motion seeks the disqualification and disgorgement of KPMG's professional fees. Because the Court concludes that KPMG does not hold an interest adverse to the estate and that KPMG is disinterested under section 327 of the Bankruptcy Code, the Objections are sustained and the Disqualification Motion is denied in its entirety.

## I. Jurisdiction

The Court has subject matter jurisdiction under sections 1334(b) and 157(a) of title 28 of the United States Code and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court, dated July 10, 1984 (Ward, Acting C.J.). This is a core proceeding pursuant to section 157(b)(2) of title 28 of the United States Code.

## II. Relevant Background

### A. Case Background

On June 25, 2002, WorldCom, Inc. ("WorldCom" or "Debtors")[2] announced that an internal audit had revealed accounting irregularities. After the accounting announcement, WorldCom's board of directors formed a special committee (the

1. The Court also received the following briefs: Letter to the Honorable Arthur J. Gonzalez from the Securities and Exchange Commission Re: the April 28, 2004 Chambers Conference, dated May 18, 2004; the Reorganized Debtors' Brief Filed Pursuant to the Court's May 7, 2004 Scheduling Order, dated May 19, 2004; Statement of KPMG LLP in to Court's May 7, 2004 Scheduling Order, dated May 19, 2004; the States' Brief in Support of Full Disclosure of the Securities and Exchange Commission Letters to the Debtors and KPMG, dated June 9, 2004; the Reorganized Debtors' Reply Brief Filed Pursuant to the

Court's May 7, 2004 Scheduling Order, dated June 16, 2004; and the Supplemental Statement of KPMG LLP in to Court's May 7, 2004 Scheduling Order, dated June 16, 2004. As described *infra*, the issues outlined therein are moot.

2. During the course of this litigation, the Debtors emerged from bankruptcy as MCI, Inc. ("MCI"), but for ease of reference within this decision, the Court will refer to MCI as WorldCom or the Debtors.

"Special Committee") to conduct an independent investigation. The Special Committee included a former United States Attorney General as a member and retained a former head of enforcement at the Securities and Exchange Commission (the "SEC") as its Special Counsel.

On June 26, 2002, in response to the Debtors' June 25, 2002 disclosures, the SEC commenced an enforcement action against WorldCom for violations of various securities laws. The Debtors cooperated with this and other governmental investigations into their affairs. On June 28, 2002, the United States District Court for the Southern District of New York (the "District Court") approved a stipulation and order providing for the appointment of a corporate monitor ("Corporate Monitor"). On July 3, 2002, the District Court appointed Richard C. Breeden, a former chairman of the SEC, as Corporate Monitor with the consent of WorldCom and the SEC. Pursuant to the June 28, 2002 order and subsequent orders entered by the District Court, the Corporate Monitor is responsible for, *inter alia*, overseeing the document retention policies of WorldCom, approving all compensation and similar payments to employees and any outside professionals or advisors, working with the Debtors regarding corporate governance to ensure the highest level of corporate integrity, and attending board meetings.

On July 21, 2002 and November 8, 2002, the Debtors commenced voluntary cases under the Bankruptcy Code. By orders, dated July 22, 2002 and November 12, 2002, the Debtors' Chapter 11 cases were consolidated for procedural purposes and are being jointly administered. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On July 29, 2002, the United States Trustee for the Southern District of New York (the "United States Trustee") appointed the statutory committee of unsecured creditors (the "Creditors' Committee"). No trustee has been appointed in these Chapter 11 cases.

On July 22, 2002, this Court entered its Order Granting the Motion of the United States Trustee for the Appointment of an Examiner. On August 6, 2002, this Court entered its Order Approving Employment of Dick Thornburgh as Examiner (the "Examiner").

On December 17, 2002, all members of the Board of Directors who served prior to the commencement date announced their resignation.

On May 28, 2003, this Court approved the Disclosure Statement for Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code (the "Disclosure Statement"). By order entered on October 31, 2003 (the "Confirmation Order"), this Court confirmed the Debtors' Modified Second Amended Joint Plan of Reorganization (the "Plan"). The Debtors' Plan went effective on April 20, 2004.

### B. KPMG's Retention

On November 8, 2002, the Debtors filed their Application for an Order Authorizing the Retention and Employment of KPMG LLP as Accountants, Auditors, and Tax Advisors Nunc Pro Tunc to July 21, 2002 (the "Application"). In the Application, the Debtors asked this Court to authorize the employment of KPMG for the purpose of, *inter alia*, auditing the Debtors' financial statements, including restated financials from past years. *See* Application at ¶ 10(a)(i). The Debtors also asked this Court to authorize KPMG to continue to serve as the Debtors' tax advisor, including advising the Debtors regarding the very tax minimization strategies described in the Disqualification Motion. *See* Application at ¶ 10(b)(iii). The Application also

requested appointment of KPMG to assist the Debtors in federal and state tax examinations.

As part of the Application, the Debtors submitted the Affidavit of Farrell Malone in Support of the Application for an Order Authorizing the Retention and Employment of KPMG LLP as Accountants, Auditors, and Tax Advisors Nunc Pro Tunc to July 21, 2002 (the "Malone Affidavit"). In the Malone Affidavit, KPMG disclosed that the Debtors had appointed KPMG as auditors in May 2002 and had employed KPMG as tax advisors since 1997. *See* Malone Affidavit at ¶ 4. KPMG also disclosed that it expected to continue providing accounting, auditing and tax services for the Debtors post-petition. *See* Malone Affidavit at ¶¶ 6(a)(i), 6(b)(iii).

Additionally, an exhibit to the Malone Affidavit made a detailed disclosure of the scope of tax services that KPMG would provide to the Debtors and the general conditions applicable to such services. The Application disclosed that KPMG would use its "judgment in resolving questions where the tax law is unclear or where there may be conflicts between taxing authorities' interpretations of the law and other supportable positions." Malone Affidavit, Ex. A (retention letter), at Ex. II thereto (scope of tax services). It further disclosed that, unless instructed otherwise by the Debtors, KPMG would "resolve such questions in the corporation's favor whenever possible." *Id.*

No objections were filed to the Debtors' application to retain KPMG or the terms of the engagement. On December 3, 2002, this Court entered an order authorizing the retention of KPMG, finding that, based on the representations made in the Malone Affidavit, KPMG is a "disinterested person" as defined in section 101(14) of the Bankruptcy Code.

## C. The Debtors' Intangible Asset Licensing Program And Royalty Charges

According to the Debtors, they retained KPMG to assist with an internal restructuring program intended to rationalize their corporate structure and, where appropriate, to do so in a way that minimized the Debtors' tax burdens. As a result of the restructuring, a system of intercompany charges was put in place to account for the services and benefits that each entity used or contributed to the enterprise. Among these charges was a royalty for the use of intangible assets. *See* Disclosure Statement at pp. 33–4.

The Debtors further contend that there is no dispute that, since 1998, billions of dollars in royalties have accrued to World-Com and MCI WORLDCOM Brands, LLC and that other Debtor entities have deducted the accrued royalties as expenses on their state income tax returns in states that tax income on a separate legal entity basis (as opposed to a consolidated basis as is the case with federal and many state corporate income tax systems).

These intercompany royalty charges ("Royalty Charges") have been the subject of extensive litigation in these Chapter 11 cases, including voluminous document production and numerous depositions, for nearly a year. The existence of a trillion dollars in intercompany claims, including the Royalty Charges, first received widespread attention in connection with motions of several dissenting creditor groups for appointment of a Chapter 11 trustee filed in April 2003. The existence of the Royalty Charges and KPMG's role in establishing them was the subject of testimony and documentary evidence introduced at the hearing on the trustee motions in May 2003. The subject of intercompany claims was litigated again in connection with the motion for an order directing the appointment of an official committee of

creditors for MCI Communications Corp. and its subsidiaries. The motions for the appointment of a trustee and separate committee were ultimately denied.

The Royalty Charges were the subject of dispute in connection with the Disclosure Statement. The Disclosure Statement discussed the existence of intercompany claims, the genesis of those claims in the pre-petition restructuring transactions that the Debtors had undertaken, and KPMG's role in providing tax advice and other services to the Debtors on these matters. At the request of certain dissenting creditor groups, an additional disclosure was added regarding their contentions about the validity of the Royalty Charges:

> *Royalty Claim* s. Based upon the Dissenting MCI Creditors' review of the FTI [Creditors' Committee forensic accountants] report, the Dissenting MCI Creditors assert that the overwhelming majority of the WorldCom Companies' claims against MCI, almost $20 billion out of $24 billion, are for royalty charges and believe that the royalty claims are not legally cognizable and would not be allowed by the Bankruptcy Court.

Disclosure Statement at p. 48. Although, the States, as early as May 13, 2003, filed their respective objections to Motion to Approve/Debtors' Motion for Entry of Order (i) Approving the Disclosure Statement; (ii) Fixing a Record Date; (iii) Approving Solicitation Packages and Procedures for Distribution Thereof; (iv) Approving Forms of Ballots and Establishing Procedures for Voting on the Debtors' Joint Plan of Reorganization; and (v) Scheduling a Hearing and Establishing Notice and Objection Procedures in Respect of Confirmation of the Debtors' Joint Plan of Reorganization filed on April 24, 2003, such objections did not address the Royalty Charges.

During the summer of 2003, the Royalty Charges continued to be the subject of dispute and discovery in connection with confirmation of the Debtor's proposed plan of reorganization. Two KPMG partners responsible for the earlier engagement gave depositions, as did personnel from the Debtors' tax department. Three expert witnesses submitted reports dealing with the intangible asset licensing program, each of which reviewed and analyzed the extensive, contemporaneous documentation that KPMG had created. Although the objections of the dissenting creditor groups were settled before the Court heard testimony on the Royalty Charges, that settlement did not occur until September 9, 2003—after the dissenting creditors and the Debtors had filed briefs spelling out their contentions regarding the validity of the Royalty Charges. There is no record of the States participating in the deposition or any other discovery during this period.

On July 28, 2003, the State of Oklahoma filed its Limited Objection of States of Oklahoma, Arkansas, California, Connecticut, Illinois, Louisiana, Massachusetts, Missouri, Montana, New Jersey, Puerto Rico, South Dakota, Tennessee, and Virginia to Confirmation of Debtors' Amended Joint Plan of Reorganization Dated July 9, 2003 (the "States' Plan Objection"). As discussed further below, the States' Plan Objection contained no reference to any of the issues raised in the Disqualification Motion. The States' Plan Objection was resolved and the Plan subsequently confirmed in a manner that did not affect the Debtors' retention of KPMG.

On September 2, 2003, the Commissioner of Revenue for the Commonwealth of Massachusetts (the "Commissioner") filed a Motion on Behalf of Massachusetts, New York, Connecticut, New Mexico, Iowa, Illinois, Pennsylvania, North Carolina, Virgi-

nia, and Other Similarly Situated States, to Extend the Deadline for Filing Proofs of Claim (the "Bar Date Extension Motion"). In the Bar Date Extension Motion, the Commissioner asked this Court to extend the bar date for filing pre-petition claims because certain dissenting creditors had allegedly revealed that "royalty charges totaling approximately $19,000,000,000 incurred by MCI and its subsidiaries were apparently part of a tax avoidance scheme that was intentionally concealed from the State taxing authorities over the three-year pre-petition period [from] 1999–2001." Bar Date Extension Motion at ¶ 5. In support of the Bar Date Extension Motion, the States alleged that "the facts necessary to uncover and identify the tax avoidance aspects of the Debtors' royalty plan and other accounting practices were not known or readily discoverable prior to January 23, 2003." Bar Date Extension Motion at ¶ 20. January 23, 2003 was the Bar Date established by the Court for these cases.

On September 2, 2003, the Commissioner filed a Motion Directing the Debtor, Scott Sullivan, and KPMG LLP to Appear for Rule 2004 Examination and to Produce Documents in Connection Therewith (the "Rule 2004 Motion"). In the Rule 2004 Motion, the Commissioner set forth the allegation that the Debtors' royalty deductions were improper. *See* Rule 2004 Motion at ¶ 11 ("On or about April 14, 2003 ... the Debtors publicly disclosed for the first time what has become known as a $19 billion sham royalty claim of WorldCom, Inc. against MCI."). On October 15, 2003, this Court entered an order granting the Rule 2004 Motion.

*D. The Plan*

The Plan requires the issuance and listing of New Common Stock (the "New Common Stock") on the NASDAQ National Markets System for trading "on or soon as practicable after the Effective Date." Plan at § 9.05.

The Plan provides that all property of the estate (including causes of action) revests in the Debtors and the Reorganized Debtors upon the Effective Date. *See* Plan at § 10.01. Further, the Plan specifically preserves the Debtors' right to assert causes of action. *See* Plan at § 10.08 ("[N]othing contained in the Plan or the Confirmation Order shall be deemed a waiver or a relinquishment of any Causes of Action that the Debtors or the Reorganized Debtors may choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code...."). Further, section 13.14 of the Plan provides that the Plan shall be binding on all parties to the Debtors' bankruptcy case, including, without limitation, all holders of Claims against the Debtors. *See* Plan at § 13.14. The Plan and the Confirmation Order provide that all causes of action re-vest in the Debtors. The States did not object to these provisions of the Plan and the Confirmation Order, nor did they, or any other party, appeal the Confirmation Order. The Plan went effective on April 20, 2004. Thus, the Plan vests the Debtors with the sole discretion to assert causes of action, including any action against KPMG, on behalf of their estates.

*E. The Examiner's Third And Final Report*

On January 26, 2004, the Examiner filed his Third and Final Report (the "Final Report"). The Examiner sought to identify the potential causes of action that the Examiner, after reviewing the applicable facts and law, believed would most likely survive motions to dismiss or for summary judgment and reach a fact-finder if presented in a lawsuit. *See* Final Report at 9

n. 7. In his Final Report, the Examiner stated that he began to investigate the allegedly improper royalty deductions after certain dissenting creditors had raised the issue. *See* Final Report at 36 ("The potential issues with the Royalty Programs came to the Examiner's attention in the summer of 2003."). Despite commenting on alleged delays in obtaining information relevant to his investigation of the royalty deductions, the Examiner determined that he was satisfied with the information he received. *See* Final Report at 37 ("[T]he Examiner is satisfied that he ultimately interviewed the key persons available to him and with knowledge relevant of the Royalty Programs and that he has received sufficient information to support the conclusions reached in this Third and Final Report.").

After undertaking an investigation of the Royalty Charges, the Examiner made several conclusions in his Final Report. First, the Examiner concluded that the royalty programs "were not well conceived or implemented, and are vulnerable to challenge by various states." Final Report at 28. Second, the Examiner concluded that if the States successfully challenged the royalty deductions, the Debtors may have a potential claim against KPMG. *See* Final Report at 13 ("To the extent that state taxing authorities bring actions and prevail, the Examiner believes that World-Com has claims against KPMG."). Third, the Examiner identified potential defenses that KPMG would have to such an action. *See* Final Report at 43 ("It is possible, however, that a state deficiency finding would be founded instead in whole or in part on the Company's implementation failures.... In such an instance, the Company's claims against KPMG could be reduced or even eliminated."). Finally, the Examiner recognized that the Debtors possessed the discretion and authority to determine whether or not to bring a cause of action against KPMG:

> The Examiner recognizes that the WorldCom plan of reorganization assigns any such claims to WorldCom and that the Company may have valid reasons, in exercising its business judgment, not to pursue particular potential claims.... The Examiner expresses no opinion as to whether any of the claims should actually be pursued. Rather, the Examiner views it as his responsibility to identify potential claims and to leave it to the Company to decide which, if any, of the claims to pursue.

Final Report at 5.

In a press release issued by MCI on January 26, 2004, MCI stated that "KPMG's involvement in [the tax] program has previously been carefully reviewed by our current Audit Committee of the Company's Board of Directors and the Company's inside and outside counsel.... As a result, the Company has no plans to pursue claims against KPMG.". On March 5, 2004, Anastasia Kelly, Executive Vice President and General Counsel of the Debtors, sent a letter to KPMG regarding the findings contained in the Final Report (the "Letter"). The Letter states that, "the Company does not intend to pursue any claim against KPMG relating to MCI's intangible asset licensing program, the related intercompany transactions, and their associated tax implications." KPMG Response and Objection, Ex. B at 1.

### F. Disqualification Motion And The April 16 Hearing

On March 17, 2004, the States filed the Disqualification Motion with a return date (i.e. hearing date) for April 13, 2004 (the "April 13 Hearing"). At the Court's direction, a conference call was held on March 19, 2004 (the "March 19 Conference

Call")[3] in which the Court raised the issue of whether, in light of the Disqualification Motion, KPMG was qualified to receive continued payments under the Order Pursuant to Sections 105(a) and 331 of The Bankruptcy Code Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals, dated August 13, 2002, (the "Monthly Compensation Order"). During the March 19 Conference Call, the Court stated its view that the Disqualification Motion should be construed as an objection to KPMG's monthly fees which in turn, under the Monthly Compensation Order, prevents payment by the Debtors to KPMG until the resolution of such objection or further order of the Court. After the Court's comments, the Debtors stated that they would terminate payment of monthly fees to KPMG until further order of the Court.

During the March 19 Conference Call, the amount of time that would be allocated for the April 13 Hearing was raised. The Court stated that it did not know the amount of time that would be allocated because it did not know whether witnesses were going to be presented. The States responded that they were not aware that the April 13 Hearing was evidentiary but instead assumed that the Court would schedule an evidentiary hearing if, following oral argument on the Disqualification Motion, the Court deemed it necessary. The Court instructed the parties that if they decided to present evidence, evidence could be presented at the April 13 Hearing. The Court also directed the parties to discuss the issues amongst themselves and inform the Court accordingly.

In the March 19 Conference Call, the Court recalls that the States argued that Rule 408 of the Federal Rules of Evidence ("Rule 408") prevented the Debtors from referring to the circumstances surrounding the proposed filing of the Disqualification Motion because it had been raised in a settlement conference between the parties. Further, the Court recalls advising the States that it did not believe that Rule 408 applied under the circumstances presented.

Shortly thereafter, the States issued discovery requests in connection with the Disqualification Motion. On March 30, 2004 the Debtors and KPMG expressed their objections to the States' requests for discovery and requested a conference with the Court to discuss these objections. *See* LBR 7007–1(b). A conference was held on March 31, 2004, at which time the Court directed the States, the Debtors and KPMG to submit letters setting forth the facts in dispute that may need to be addressed by discovery. On April 9, 2004 the Court presided over a hearing to address the issues raised in the correspondence submitted by the parties (the "April 9 Hearing"). At the conclusion of the April 9 Hearing, the Court informed the parties that it would rule on the States' discovery requests on April 13, 2004 and adjourned the hearing on the Disqualification Motion until April 16, 2004 if the discovery requests were denied and to sometime thereafter if the discovery requests were granted. The Court denied the States' discovery requests on April 13, 2004 by finding, among other things, that the States' discovery requests were neither warranted, required nor appropriate to resolving the issue before the Court.

Having denied the States' request for discovery, the hearing on the Disqualification Motion was held on April 16, 2004 (the "April 16 Hearing"). During the course of the April 16 Hearing to consider the Disqualification Motion, there was colloquy between the Court and the States' counsel

---

**3.** The March 19 Conference Call was not recorded or transcribed.

regarding whether any inferences could be drawn from the fact that the SEC and the United States Trustee were not taking a position concerning the Disqualification Motion. Thereafter, in light of what transpired at the April 16 Hearing, the Debtors' counsel notified a member of the Court's staff that there was an issue regarding the SEC that they believed should be brought to the Court's attention and requested an *in camera* conference to discuss the matter. The Court was notified of the request and a recess was taken. The Court then held an *in camera* chambers conference (the "April 16 Conference") where the Debtors first revealed to the Court and the States that the SEC had made a confidential request for information to the Debtors and KPMG (hereinafter, the "SEC Requests"), in connection with the issues raised in the Final Report. The Debtors stated that they requested the conference be held *in camera* because they considered the transmission of the SEC Requests to the Debtors and KPMG confidential.[4] The Debtors obtained copies of the SEC Requests and indicated to the Court that the SEC did not oppose providing copies to the parties to the Disqualification Motion, on a confidential basis.[5] The Court called a brief recess to allow the parties time to review the SEC Requests privately in order to formulate an argument regarding the SEC Requests' relevance to the Disqualification Motion.

Thereafter, the Court convened the April 16 Hearing, *in camera* (the "April 16 *In Camera* Hearing") where the States'

counsel renewed an earlier request for discovery seeking the documents requested in the SEC Requests. The Court denied this request orally at the April 16 *In Camera* Hearing. The Court heard further argument from the parties on disqualification related to the SEC letter requests. At the end of the April 16 *In Camera* Hearing, the Court directed the parties that the requests from the SEC were to remain confidential until further order of the Court.

At the conclusion of the April 16 Hearing, the Court informed the parties that by April 20, 2004 the Court would either decide the merits of the Disqualification Motion or otherwise advise the parties how the Court intended to proceed. On April 20, 2004, the Court issued an order, among other things, informing the parties that the Court would first review the transcript of the hearing and then determine whether further action by the parties would be appropriate in this matter.

### G. SEC Requests And Disclosure Under Rule 2014

On April 28, 2004, the Court held an *in camera* hearing and ordered a briefing schedule to address the disclosure of the SEC requests under Rule 2014. The April 28 Hearing was attended by counsel for the States, the SEC, the United States Trustee, the Debtors and KPMG. During the April 28 Hearing, the Court ordered the Debtors and KPMG to submit the documents that each had been producing

---

4. Upon review of the SEC Requests, the Court found that the Debtors' request for *in camera* disclosure of the requests was warranted. The requests provide that they are "confidential and should not be construed as an indication by the Commission or its staff that any violation of law has occurred, nor as an adverse reflection upon any person, entity or security."

5. A representative of the United States Trustee was not present at the April 16 Conference or the April 16 *In Camera* Hearing. However, copies of the SEC Requests were given to the United States Trustee at the April 28, 2004 *in camera* hearing, (the "April 28 Hearing"), at which time, the events that transpired on April 16, 2004 were conveyed to the United States Trustee.

to the SEC in response to the SEC Requests for review by the Court (hereinafter, the "SEC Production"). The Court denied the States' request for access to the SEC Production; however, to the extent that the United States Trustee's Office sought to review the documents, the Court directed that the SEC Production could be made available on a confidential basis.[6] The SEC Production consists of approximately thirty-five boxes of documents and five compact discs containing electronic copies of documents. The SEC Production has been provided to the Court by the Debtors and KPMG, and the Court has reviewed the documents.

On May 19, 2004, and pursuant to the briefing schedule set at the April 28 Hearing,[7] the Debtors filed their Brief Filed Pursuant to the Court's May 7, 2004 Scheduling Order stating their opposition to the disclosure of the SEC Requests. By letter dated May 18, 2004, the SEC stated that it would not file any briefs on the issue. Other than this letter dated May 18, 2004, the SEC has not filed any pleadings regarding the Disqualification Motion. The States filed its Brief in Support of Full Disclosure of the SEC Letters to the Debtors and KPMG, on June 9, 2004.

On June 4, 2004, the Court was advised by the Debtors that on or about June 1, 2004 one of the Debtors' professionals disclosed in its fee statement, filed with the Court, a reference to the SEC inquiry which should have been redacted from the statement. The Debtors requested that the Court authorize the removal of the fee statement from the Court's docket because of the error. It was expected that a redacted version of the statement would be filed. The Court granted the request in an order dated June 4, 2004 (the "June 4 Order").

Following the June 4 Order, the Court became aware that the information concerning the SEC inquiry was publicly disseminated, presumably prior to the removal of the document from the docket. The Court convened another *in camera* conference on June 10, 2004 (the "June 10 Conference"), to address the necessity of sealing documents in light of the public disclosure. During the June 10 Conference, the Court advised the parties of its belief that, in light of public disclosure of the existence of the SEC Requests, the continued sealing of the record with respect to the Disqualification Motion was no longer necessary. The Court advised the parties that the SEC Production was not to be included in the materials to be unsealed. The Court informed the parties that the sealed documents would be released on June 14, 2004, unless a request for a hearing was made by noon on June 14, 2004.

No request for a hearing was made. Hence, on June 14, 2004, the Court issued an Order Pursuant to Bankruptcy Rule 9018 Lifting Seal as to Certain Transcripts of Proceedings, Orders, Pleadings and

---

6. To the best of the Court's knowledge, the United States Trustee's Office has not requested any of the material in the SEC Production. However, at the April 28 Hearing KPMG represented that the United States Trustee's Office requested certain information from KPMG regarding the matter. Although the United States Trustee has been actively involved in these cases, including the retention of all professionals, the filing of a request for the appointment of an examiner at the outset of the cases, the disclosure and confirmation hearings, and has been present at many of the hearings and has participated in conference calls held regarding the Disqualification Motion, no pleadings have been filed by the United States Trustee regarding any aspect of the Disqualification Motion.

7. The briefing schedule is embodied in an Order dated May 7, 2004.

Documents in connection with the Disqualification Motion. However, as the Court made clear at the June 10 Conference, the documents that would be released did not include the SEC Production. The SEC Production was not made available to the States due to the denial of their discovery requests, as discussed more fully below.

On June 16, 2004, the Debtors and KPMG both filed responses to the States' June 9 brief, arguing *inter alia,* that the issue of disclosure for purposes of the Disqualification Motion was rendered "moot" as a result of the disclosures referenced above. The Court held a hearing on June 23, 2004 where the States agreed that under the circumstances as to disclosure under Rule 2014, the issue was now moot; thereupon the record of the Motion was complete.

### III. Discussion

*A. Legal Standard*

■ Section 327(a) of the Bankruptcy Code authorizes a trustee or debtor in possession [8] to employ professionals, with court approval, during the course of a bankruptcy case. *See* 11 U.S.C. § 327(a). Section 327(a) provides, in pertinent part, that a debtor may retain professionals that do not "hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the debtor's duties under this title." 11 U.S.C. § 327(a). According to the plain language of the statute, in order to qualify for retention under section 327(a) of the Bankruptcy Code a professional: 1) must not hold an interest adverse to the bankruptcy estate; 2) must not represent an interest adverse to the estate; and 3) must be disinterested.[9]

■ An adverse interest is not defined in the Bankruptcy Code. *See Bank Brussels Lambert v. Coan (In re AroChem Corp.),* 176 F.3d 610, 623 (2d Cir.1999) ("The Bankruptcy Code does not define the phrase 'hold or represent an interest adverse to the estate.' "). The Second Circuit has relied upon the following definition of adverse interest:

(1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or

(2) to possess a predisposition under circumstances that render such a bias against the estate.

*In re AroChem Corp.,* 176 F.3d at 623. Stated another way, if it is plausible that another interest may cause the professional to act any differently than they would without that other representation, then

---

**8.** "Upon the filing of a voluntary [C]hapter 11 petition, a debtor automatically becomes a 'debtor in possession' [and][a]s such occupies the shoes of a bankruptcy trustee in every major way." *Unofficial Committee of Equity Holders v. McManigle (In re Penick Pharmaceutical, Inc.),* 227 B.R. 229, 232 (Bankr. S.D.N.Y.1998). Section 1107 gives the debtor in possession the powers given to a trustee under Chapter 11. *See* 11 U.S.C. § 1107.

**9.** "By its terms, section 327 distinguishes between 'holding' an interest and 'representing' one." *Bank Brussels Lambert v. Coan (In re AroChem Corp.),* 176 F.3d 610, 629 (2d Cir. 1999). Here there is no allegation that KPMG *represents* an interest adverse to the estate. A party represents an interest adverse to the estate when a professional acts as agent for someone holding an adverse interest. *See In re Envirodyne Indus., Inc.,* 150 B.R. 1008, 1016–17 (Bankr.N.D.Ill.1993) ("To 'represent an adverse interest' means to serve as agent or attorney for any individual or entity holding such an adverse interest."). Because KPMG was not operating as anyone's agent but instead on their own behalf, the only relevant inquiry here is whether KPMG holds an interest adverse to the estate and whether KPMG is disinterested.

that professional would have a conflict and an interest adverse to the estate warranting disqualification. *See In re Leslie Fay Cos., Inc.,* 175 B.R. 525, 533 (Bankr. S.D.N.Y.1994). The decision whether an adverse interest exists is determined by the court on a case by case basis. *In re AroChem Corp.,* 176 F.3d at 623.

A "disinterested person," in contrast, is defined in Bankruptcy Code section 101(14), which provides, in relevant part, that a disinterested person:

> (A) is not a creditor, an equity security holder, or an insider; . . .

> (D) is not and was not, within two years before the date of filing of the petition, a director, officer, or employee of the debtor; . . . and

> (E) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor.

11 U.S.C. § 101(14). Courts have noted that the materially adverse interest standard incorporated into the definition of disinterestedness under section 101(14)(E) and the "interest adverse to the estate" language in section 327(a) overlap and are duplicative, forming a single test to judge conflicts. *See, e.g., In re Granite Partners, L.P.,* 219 B.R. 22, 33 (Bankr.S.D.N.Y. 1998); *see also In re Enron Corp.,* No. 01–16034(AJG), 2002 WL 32034346, at *8 (Bankr.S.D.N.Y. May 23, 2002).

▇▇▇ Rule 2014(a) requires a professional seeking an order for employment in a bankruptcy case to submit a verified statement setting forth the professional's connections to the debtor, creditors, or any other party in interest, including their counsel and accountants. The purpose of Rule 2014 is to provide the Court (and the United States Trustee) with information to determine whether the professional's retention is in the best interests of the estate, *see In re Leslie Fay Cos., Inc.,* 175 B.R. 525, 533 (Bankr.S.D.N.Y.1994), and to maintain the integrity of the bankruptcy system. *See In re Envirodyne Indus., Inc.,* 150 B.R. 1008, 1021 (Bankr.N.D.Ill. 1993). Courts have ruled that Rule 2014 disclosures are to be strictly construed, *see In re Leslie Fay,* 175 B.R. at 533, and the professional must disclose all facts that bear on disinterestedness and cannot usurp the court's functions by selectively incorporating materials the professional deems important. *See In re Granite Partners, L.P.,* 219 B.R. at 35. Failure to disclose relevant connections is an independent basis for disallowance of fees or disqualification from the case. *See In re Leslie Fay,* 175 B.R. at 533.

## B. Legal Analysis

The Disqualification Motion raises three principal issues not specifically earmarked by the States into the aforementioned legal standard. First, the States argue that as a part of auditing the Debtors' restatement of its financials, KPMG would have to evaluate the soundness of its own tax minimizing strategies and thereby have its own financial interest at stake. The States contend that allowing KPMG to evaluate the soundness of its own strategies plainly demonstrates the existence of a conflict of interest and therefore, KPMG is not disinterested. *See* Disqualification Motion ¶ 33. Second, the States argue that KPMG holds an interest adverse to the estate because the Debtors have a potential cause of action against KPMG in the event that the royalty deductions are ultimately disallowed. *See* Disqualification Motion. ¶ 34. This contention is apparently founded upon the Final Report and based upon the premise that the potential cause of action

translates into a financial interest held by KPMG. Finally, the States also contend that the mere appearance of impropriety is enough to warrant KPMG's disqualification.[10]

In response, KPMG contends that it holds no interest adverse to the estate and, *a fortiori*, is disinterested. KPMG argues that it holds no interest adverse to the estate because both the Debtors and KPMG support the validity of the tax planning that the States claim is invalid. Moreover, KPMG argues that speculation over whether KPMG may be involved in litigation with the Debtors based on uncertain future events is insufficient to warrant disqualification. Finally, KPMG posits that the Debtors are vested under the Plan with the sole discretion and authority to pursue causes of action and the Debtors have determined not to pursue causes of action against KPMG.

In support of KPMG's arguments, the Debtors contend that KPMG does not hold an interest adverse to the estate and is disinterested. The Debtors further argue that there is no actual conflict between the Debtors and KPMG nor is there any appearance of impropriety. Finally, the Debtors argue that the Disqualification Motion should be rejected because the Disqualification Motion is an open and notorious attempt by the States to gain tactical advantage in litigation concerning the States' claims that question the propriety of the Debtors' licensing and royalty program.

*(i) The States Were Dilatory In Prosecuting The Disqualification Motion And The Pursuit Of The Disqualification Of KPMG Was A Litigation Tactic*

█ In April 2003, several dissenting creditor groups filed motions for appointment of a Chapter 11 trustee. In connection with the motions and the hearing on the motions in May 2003, the issues regarding the intercompany charges, including the Royalty Charges and KPMG's role in establishing them were raised and were the subject of testimony and documentary evidence. The Royalty Charges were the subject of dispute in connection with the Disclosure Statement, filed on May 23, 2003 and approved by Court order dated May 28, 2003. As early as May 13, 2003, the States filed their respective objections to the Motion for Entry of an Order Approving Joint Disclosure Statement. During the summer of 2003, the Royalty Charges again were the subject of dispute and discovery in connection with confirmation of the Debtors' proposed plan of reorganization.

Throughout these cases, the States have been actively involved in these Chapter 11 cases. As stated above, the States filed their respective objections, as early as May 13, 2004, to the Motion to Approve/Debtors' Motion for Entry of Order (i) Approving the Disclosure Statement; (ii) Fixing a Record Date; (iii) Approving Solicitation Packages and Procedures for Distribution Thereof; (iv) Approving Forms of Ballots and Establishing Procedures for Voting on the Debtors' Joint

---

10. At the April 16 Hearing, the States added an additional argument that implicates KPMG's disclosure obligations under Rule 2014 and the Malone Affidavit. The States contend, principally, that KPMG failed to disclose that an indemnity agreement existed between WorldCom and KPMG in connection with the disputed tax advice. Having consid-

ered their contentions, and the appropriate legal standard, *see In re Enron Corp.*, 2002 WL 32034346, at *5 (outlining legal standard), the Court concludes that KPMG complied with its obligations under Rule 2014 regarding the Malone Affidavit and there is no basis to further consider Rule 2014 as grounds for disqualification.

Plan of Reorganization; and (v) Scheduling a Hearing and Establishing Notice and Objection Procedures in Respect of Confirmation of the Debtors' Joint Plan of Reorganization, filed on April 24, 2003. The Court notes that such objections did not address the Royalty Charges. However, it is clear that the States were aware that KPMG created the royalty structure, that such structure was being attacked as a sham, and that KPMG was also the auditor for the Debtors. On July 28, 2003 the States filed an objection to the Debtors' Plan containing no references to the Plan's language regarding the causes of action which vested in the reorganized Debtors, including the Royalty Charges. Further, the States concede that the information upon which the Disqualification Motion is based was known for nearly one year. *See* Disqualification Motion at ¶¶ 10, 11. On September 2, 2003, the States filed a motion to extend the deadline for filing proofs of claim related to the royalty deductions. That motion, as well as the States' Plan Objection were resolved by a stipulation dated September 12, 2003, extending the bar date for claims relating to the royalties. Neither the States, nor any other party, appealed the Confirmation Order, which is now final.

At the same time, Massachusetts sought, and was granted, leave to conduct a Rule 2004 examination of KPMG in connection with the Royalty Charges and in its Motion stated that it reviewed the Debtors' royalty deductions. *See* Disqualification Motion ¶ 11 ("On or about April 14, 2003 . . . the Debtors publicly disclosed for the first time what has become known as a $19 billion sham royalty claim of WorldCom, Inc. against MCI."). In response to the States' requests, the Debtors have provided extensive information to the States, as well as to the Multistate Tax Commission, which has conducted an audit of the royal-

ties on behalf of the States. On October 2, 2003, the Debtors sent counsel for Massachusetts two boxes of documents relating to the Royalty Charges, including copies of the contemporaneous supporting documentation that KPMG had prepared. At no time, in spite of the fact the States knew that the structure created by KPMG was alleged to be a "sham," did the States, or any other party, the United States Trustee, the SEC or the Corporate Monitor, raise the issue of KPMG's continuing role in the cases as auditor and tax advisor. Thus, the underlying basis of the Disqualification Motion was present as of April 2003.

The Final Report sets forth the view of the Examiner as to the validity of the royalty program and the potential causes of action that may exist if such program was found to be invalid—recognizing that such causes of action may only be brought by the Reorganized Debtors under the Plan. There was no reason, however, for the States to wait until the Final Report to raise any issue regarding the alleged "sham" nature of the royalty structure and the possibility of a cause of action commenced by the Debtors, which arguably would warrant the disqualification of KPMG as Debtors' independent auditor. Furthermore, this is especially true for a taxing authority that relies upon an entity's financial statements and representations while carrying out its duties and obligations. The States, as taxing authorities, fully understand the implications of interplay between tax advice and auditing when the tax advice provided by an independent auditor is challenged, as is the case here.

■ On March 17, 2004, the States brought the Disqualification Motion, as referenced above, only after the Examiner issued his Final Report.[11] An unjustified

---

11. Even if the Court were to believe, and this Court does not, that the States may have

delay in bringing a motion to disqualify provides a separate ground to deny the relief requested in the underlying motion. *Exco Resources, Inc. v. Milbank, Tweed, Hadley & McCloy L.L.P., et al. (In re Enron Corp., et al.)*, No. 02 Civ. 5638(BSJ), 2003 WL 223455 at *4 n. 2 (S.D.N.Y. Feb.3, 2003)(holding that the bankruptcy court was correct in finding an unjustified delay in bringing the motion to disqualify provided a separate ground to deny relief, where motion was brought nearly two months after the underlying basis for the Disqualification Motion was known).

Applied here, the States have had access to the information necessary to raise the issues that are the subject of the Disqualification Motion for more than ten months. The grounds on which the Disqualification Motion are based have been ripe since April 2003 and open and notorious since May 2003. It was only after the States decided that such a motion would advance their particular interests that they filed the Disqualification Motion. The States argued that they were not sure how the royalty structure impacted their claims and were not clear whether they had standing. There is no basis for the standing issue: the States were clearly creditors and had actively participated in these cases. There is no plausible argument that the States, or any other party in interest, did not have standing to bring a motion to disqualify KPMG.

As further evidence of the States' motivation behind filing the Disqualification Motion, during a telephonic conference prior to the filing convened as a settlement conference with the Debtors on the States' proof of claims, the States raised the issue of filing a motion to disqualify at the conclusion of the call. *See* April 16 Hearing Tr. 72:21–75:16. A request was made by the Debtors during that conference call to delay the filing of the Disqualification Motion until the parties could meet in Boston.[12] *Id.* at 75:7–10. The States acknowl-

needed the Final Report to understand the implications of the alleged conflict before they would move for the disqualification of KPMG, nonetheless it took them nearly two months after the Final Report to file the Disqualification Motion.

**12.** The States acknowledged that the Disqualification Motion was raised in the context of settlement negotiations because when first brought to the attention of the Court during the March 19 Conference Call, the Court recalls that the States argued that Rule 408 prevented the Debtors from referring to the circumstances surrounding the proposed filing of the Disqualification Motion because it had been raised in a settlement conference. The Court denied the States' request finding that Rule 408 was not applicable, since there was no allegation that it was raised in the context of settlement discussions regarding issues underlying the Disqualification Motion, but raised in settlement discussions regarding the States' proofs of claims.

In any event, Rule 408 does not exclude all settlement materials from trial. "Evidence of an offer to compromise, though otherwise barred by Rule 408, can fall outside the Rule if it is offered for 'another purpose', i.e:, for a purpose other than to prove or disprove the validity of the claim the offers were meant to settle." *Trebor Sportswear Co. v. The Limited Stores, Inc.*, 865 F.2d 506, 510 (2d Cir.1989) (citations omitted). Thus, even if the discussions between WorldCom and the States can be considered conduct made in compromise negotiations under Rule 408, the Court "has broad discretion as to whether to admit evidence of settlement ... offered for 'another purpose.' In applying the 'another purpose' exception to Rule 408, the trial judge should weigh the need for such evidence against the potentiality of discouraging future settlement negotiations." *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 293 (2d Cir.1999) as cited in *ESPN Inc. v. Office of Com'r of Baseball*, 76 F.Supp.2d 383, 412 (S.D.N.Y.1999) (internal quotations and citations omitted). Having considered the prevailing legal standard the Court concludes that the arguments and evidence related to the filing of the Disqualification Motion is

edged that the filing of the Disqualification Motion was filed after the meeting in Boston, but claim that such was not related to the request by the Debtors. Considering all of the aforementioned, the Court finds by filing the Disqualification Motion, the States acted in connection with a litigation strategy that served their own pecuniary interest. Any argument by the States that they have pursued the disqualification of KPMG to protect the public interest "rings hollow" in light of the fact that the very conflict they allege warrants disqualification was known to them for no less than ten months before they decided to file the Disqualification Motion. There is no doubt that the validity of the Royalty Charge will be the subject of significant litigation in the context of the claims allowance process in these cases, but a motion to disqualify is not the proper vehicle to initiate the litigation process.

The delay in bringing the Disqualification Motion until the eve of the Debtors' emergence from bankruptcy was potentially disruptive to the Debtors' reorganization; the interests of all creditors in these Chapter 11 cases would have been hindered by the disqualification, as emergence could have been delayed without any foreseeable benefit to the Debtors' estates. Specifically, the effect of disqualification would have been to potentially delay the effective date of the plan while the Debtors retained new auditors to certify the 2003 financials, delaying resolution of the States' tax claims and distributions to all creditors, including the States. In addition, had the States raised the issue at an earlier juncture in the case, the Court could have taken corrective measures to address the States' concerns, if such were warranted. Therefore, the Court finds that the States, in addition to having filed the Disqualification Motion as a litigation

tactic, were dilatory in the prosecution of the Disqualification Motion. Although the Court could deny the Disqualification Motion on these grounds, because of the seriousness of the allegations and their impact on Debtors as well as KPMG, the Court will decide the Disqualification Motion on the merits.

*(ii) KPMG Holds No Interest Adverse To The Estate, Is Disinterested And There is No Appearance of Impropriety*

In addressing the States' contentions, the Court concludes as follows. As an initial matter, there is no indication that KPMG is a creditor, an equity security holder or an insider. Accordingly, section 101(14)(A) is inapplicable. Moreover, KPMG was and is not a director, officer, or employee of the Debtors, nor do the States make any allegation that KPMG is or has been. Accordingly, section 101(14)(D) is also inapplicable. The Court will devote the remainder of this discussion to whether KPMG holds an adverse interest and whether KPMG is disinterested.

First, the States argue that KPMG holds an interest adverse to the estate because the Debtors have a potential cause of action against KPMG in the event that the royalty deductions are ultimately disallowed. An interest is not considered adverse simply because it is possible to conceive of a situation where interests might clash. *In re Leslie Fay*, 175 B.R. at 532. Here, KPMG does not have an interest adverse to the interests of the estate or of any class of creditors or equity holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtors simply because there is a speculative possibility that in the future, some events may ren-

admissible for the "other purpose" of high-

lighting the States alleged improper motive.

der KPMG and the Debtors adverse. By way of illustration, in order for the Debtors to have a claim against KPMG before any court of competent jurisdiction numerous uncertain events would have to transpire. First, a court would have to find that the royalty deductions were inappropriate. As the Final Report noted, a mere finding of invalidity would not be sufficient to establish any liability on the part of KPMG. Rather, a court would have to find that the royalty deductions are invalid based upon the definition of "intangible assets" under section 482 of the Internal Revenue Code, rather than on any other ground. Final Report at 43. Second, a court would also have to find that the Debtors are liable to the States for additional tax, interest, and penalties—a circumstance the Debtors contend is unlikely even if the royalty deductions are disallowed. Only, in the event that additional tax liabilities are assessed against the Debtors, on the specific ground that the licensed assets do not qualify as "intangible assets," would a *potential* claim against KPMG even exist.[13] And even if all of these events occur, it would still be within the Debtors' discretion as provided for in the Plan whether to commence an action against KPMG. The Debtors, however, already have represented and the Court has relied, that the Debtors have no intention of bringing such a claim based upon their own assessment of its viability.

In any event, since the Debtors and KPMG continue to support the tax planning, KPMG does not possess an economic interest that would tend to lessen the value of the bankruptcy estate. *See In re Aro-*

*Chem Corp.*, 176 F.3d at 623 (defining an element of an interest adverse to the estate as "any economic interest that would tend to lessen the value of the bankruptcy estate"). Additionally, because its continued support for the tax planning is consistent with that of the Debtors, KPMG has no predisposition under the circumstances to render a bias against the estates. *See id.* (defining another element of an interest adverse to the estate as "a predisposition under circumstances that render such a bias against the estate."). "[S]ection 327(a) is phrased in the present tense" and "verb tense is significant in construing statutes." *See In re AroChem Corp.*, 176 F.3d at 623. The current opinions shared by KPMG and the Debtors regarding the tax planning demonstrates that KPMG satisfies both prongs of section 327(a) of the Bankruptcy Code pertaining to disinterestedness and lack of adverse interest, and therefore KPMG's continued retention appears to be proper.

 Second, the States argue that KPMG is not disinterested because it serves as both auditor and tax advisor to the Debtors. At the hearing on the Disqualification Motion, however, the States seemed to have retreated from this argument by acknowledging that this alleged conflict is not *per se* improper. Indeed, under the applicable statutes and regulations an accounting firm is expressly permitted to act simultaneously as both auditor and tax advisor. For instance, section 10A of the Securities Exchange Act of 1934, as amended by section 201(a) of the Sarbanes–Oxley Act of 2002, specifically addresses the appropriateness of these

---

13. Furthermore, in connection with the indemnity agreement, KPMG's liability appears to be limited to ten million dollars in cases of ordinary negligence. It was also argued by the Debtors that the limit may be even less if KPMG were to succeed in allocating the limi-

tation among the various tasks it performed. There also may be further restrictions based upon which year is at issue, as there were apparently other engagement letters that concern other years.

dual roles and provides in relevant part, that a public accountant "may engage in any non-audit service, including tax services" that is not an otherwise prohibited activity under the statute.[14] There is no indication that KPMG's tax services qualify as a prohibited activity. Thus, the States contention that KPMG is not disinterested because it serves as both auditor and tax advisor to the Debtors does not appear to be well-founded and the Court, therefore, resolves this argument in favor of KPMG.

█ Third, the States argue that there is an appearance of impropriety that warrants KPMG's disqualification. Here, the Court finds no appearance of impropriety for the reasons just stated, as well as the numerous structural safeguards employed in this case designed to insure the integrity of the process. For instance, there has been active involvement from the District Court, directly and through the participation of the Corporate Monitor, in all facets of the Debtors' corporate governance. The Corporate Monitor's powers include having oversight functions over compensation and document retention issues; the authority to attend board meetings; and the authority to be present at any meeting with the Debtors and any of its outside advisors. The Court views it as implausible that WorldCom could have

shirked its fiduciary duties while the Corporate Monitor attended its board meetings, including meetings where WorldCom would have discussed not pursuing KPMG on the issue outlined in the Final Report. In addition to the oversight of the Corporate Monitor and the District Court, the SEC has been actively involved in every aspect of this case dealing with corporate governance including, the actions of the Debtors' board of directors. The Court's review of the SEC Production reveals nothing that would call into question the actions of the MCI board of directors or KPMG with respect to KPMG's independence in their role as an auditor. Further, the SEC was aware, as was the United States Trustee, of accusations about the tax structure as early as April 2003.[15]

In addition, the issues raised in the Final Report did not rise to a level of concern for the SEC to warrant calling the matter to the attention of the District Court or this Court. *See* April 28 Hearing Tr. 16:19–25, 17:1–4 ("if the [C]ommission had decided that some action was appropriate, we would inform Your Honor very quickly, as well as Judge Rakoff; but we are not in that position"). At the April 28 Hearing, the SEC stated that the letters are preliminary requests and that no inference was to be drawn from their issuance. The SEC emphasized that they are not

---

**14.** The "prohibited activities" under section 10A of the Securities Exchange Act of 1934, as amended, include:
 (1) bookkeeping or other services related to the accounting records or financial statements of the audit client;
 (2) financial information systems design and implementation;
 (3) appraisal or valuation services, fairness opinions, or contribution-in-kind reports;
 (4) actuarial services;
 (5) internal audit outsourcing services;
 (6) management functions or human resources;
 (7) broker or dealer, investment adviser, or investment banking services;
 (8) legal services and expert services unrelated to the audit; and
 (9) any other service that the Board determines, by regulation, is impermissible.
 15 U.S.C. § 78(j)–1(g).

**15.** The Court notes that the United States Trustee did not raise the issue in April 2003, nor has the United States Trustee expressed support for the Disqualification Motion. Further, the United States Trustee has been aware of the issues raised by the Final Report and has not questioned the propriety or independence of KPMG.

taking and have not taken any position on the Disqualification Motion. April 28 Hearing Tr. 16:7–10. According to the SEC, "[t]he staff of the SEC has reached no definite conclusion one way or another on the issue of whether there is a violation of the Auditor Independence Rules with respect to MCI, and that issue has never been raised with the [C]ommission." *Id.* at 16:10–16. The SEC also stated that if they had concluded there was a violation of the Auditor Independence Rules, they would have "promptly raised the matter with the [C]ommissioners to see whether they thought further action would be appropriate." *Id.* at 16:19–25; 17:1–4. The SEC further stated that there are a number of steps that the SEC takes in private investigations and there is no specific time frame for the inquiry. *Id.* at 17:22–25; 18:1–25; 22:4–19. Here, "[t]here has been no investigation opened, so there are actually at least two more steps. There is the informal document request and formal investigation can be opened, then you can have a Wells process." *Id.* at 22:4–9.

The SEC also addressed the issue of confidentiality and stated that it is generally up to the client's counsel to decide whether to disclose non-public preliminary document requests and that generally, the SEC does not advise the client to do so. *Id.* at 21:13–25; 22:1–4. The SEC stated that the reasons for keeping the SEC Requests confidential were to encourage compliance and not to unnecessarily upset the public marketplace. *Id.* at 24:3–24. Al-

though, the Court reviewed the SEC Production out of an abundance of caution, as a factual matter, the business judgment of the Debtors regarding their determination not to commence an action against KPMG was not raised in the Disqualification Motion. Nonetheless, the Court has reviewed the SEC Production and has found no indication that the determination by WorldCom is an improper exercise of its reasonable business judgment.[16] Accordingly, there is no appearance of impropriety.

*(iii) Denial Of The States' Discovery Requests*

The States made two sets of requests for discovery regarding the Disqualification Motion. The initial set of requests was made following the March 19 Conference Call commenced by the Court to address the continuing payment of KPMG under the Monthly Compensation Order. On March 30, 2004, the Debtors and KPMG objected to the requests and requested an informal conference to address their concerns. A conference was held on March 31, 2004, where the Court directed the parties to submit letters setting forth their positions regarding the discovery sought. Initially, after reviewing the facts surrounding the filing the Disqualification Motion, the allegations and legal theories expressed therein, and the issues raised in the March 19 Conference Call, it was apparent to the Court that the States intend-

16. Regarding the SEC Requests, the SEC made it clear to the Court at the April 28 Hearing that there may not be a formal investigation commenced or any further steps in its inquiry process by its staff following its review of the SEC Production. Therefore, the Court concluded that it would not be possible for the Court to await any outcome from the SEC before it ruled on the issues raised in the Disqualification Motion. Hence, the Court decided that it should proceed with a

resolution of the issues presented in the Disqualification Motion. The Court has made its determination regarding KPMG's status as an "independent auditor" based upon the facts before the Court, as set forth in the record of proceedings of the Disqualification Motion, for the purposes of section 327 of the Code. The Court's decision, therefore, is limited to the Disqualification Motion and is not intended to be a determination for any other purpose.

ed to prosecute the Disqualification Motion without discovery and rely predominantly on the Final Report for any factual assertions. Further, upon the Court's review of the SEC Requests and the Disqualification Motion, it concluded that there were no material facts in dispute regarding the grounds argued by the States that supported the contentions and legal arguments in the Disqualification Motion. In addition, the Court considered that the discovery requests made by the States were extremely broad and primarily focused on the litigation over the validity of the Royalty Charges rather than on the Disqualification Motion. If such discovery was appropriate at all, it would be in the context of any litigation regarding the Royalty Charges and not in a motion to disqualify.

The second set of discovery requests were made at the April 16 *In Camera* Hearing following the States' review of the SEC Requests. The Court took the requests under advisement. Thereafter, the Court denied the discovery requests at the April 28 *In Camera* Hearing. At the time, the Court had reviewed the pleadings, the record of the pleadings, and the various conferences and hearings, and concluded that the States brought the Disqualification Motion as a litigation tactic. Therefore, to allow the States to obtain discovery in those circumstances would not be appropriate or warranted. Further, as the Court has previously discussed above, discovery based upon the Disqualification Motion as filed was not justified.

In conclusion, the Court has found that discovery by the States related to the Disqualification Motion and the issues raised therein was not appropriate. In denying the States' requests, the Court concluded that the discovery requests sought focused on material which would assist in the underlying tax controversy and it is the Court's overall view that the States brought this motion as a litigation tactic. Therefore, the denial of discovery for the purposes of the Disqualification Motion, does not affect the rights of the parties to seek or oppose discovery of the same material in other litigation proceedings (i.e. regarding the underlying tax claims).

Regarding the Court's review of the SEC Production, and the availability to the United States Trustee on a confidential basis, the Court did so out of an abundance of caution and did not permit access to the States for reasons set forth above. The SEC Production, although reviewed by the Court, was not necessary to the disposition of the issues raised by the States in the Disqualification Motion. The SEC Production provided a more comprehensive review of issues related to KPMG's independence, not raised by the States in the Disqualification Motion.

## IV. Conclusion

For the foregoing reasons, the Disqualification Motion is denied in its entirety. Further, the Debtors are directed to resume payments to KPMG under the Monthly Compensation Order, including any accrual of payments since March 19, 2004. An order consistent with this decision will be entered simultaneously herewith.